**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

NICOLE BALL, As Parent of
RIO ALLRED, Deceased,

        Plaintiff

v.

                                    Case No. 3:22-cv-00730

ELKHART COMMUNITY                        **JURY TRIAL REQUESTED**
SCHOOL DISTRICT and
BOARD OF SCHOOL TRUSTEES
OF ELKHART COMMUNITY SCHOOLS,

        Defendants.

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiff, Nicole Ball ("Niki"), by counsel, for her Complaint against Defendants, alleges:

**I.     PARTIES**

<u>Plaintiff</u>

1. Plaintiff Nicole Ball brings this action in her capacity as the biological mother of Rio
   Allred, who was 12 years old when she died by suicide March 14, 2022.

<u>Defendants</u>

2. Defendants Elkhart Community School District and its governing body, the Board of
   School Trustees of Elkhart Community Schools (collectively "the District" unless
   otherwise noted), are an Indiana public school corporation and school board, respectively,
   which receive federal financial assistance. The board is the governing body of the Elkhart
   public school system and oversees, controls and manages its personnel and operations. As
   such, it has final policymaking authority over the Elkhart school corporation. The District
   is a public "educational institution" as defined by 20 U.S.C. § 1681(c) which operates a

1

"program or activity" as defined by 20 U.S.C. § 1687. Its principal offices are located in Elkhart County, Indiana. The school(s) where the events giving rise to these claims are owned, operated, maintained, staffed and funded by the District.

## II.    JURISDICTION

3. Plaintiff brings this action on behalf of her daughter to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as more fully set forth below.

4. This Court has jurisdiction over Plaintiff's claim(s) arising under the Constitution or laws of the United States pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983. Supplemental jurisdiction over Plaintiff's state law claim(s) exists under 28 U.S.C. § 1367.

## III.    VENUE

5. Venue is in this judicial district pursuant 28 U.S.C. § 1391(b) because the District maintains its principal offices in this district and all events giving rise to this action occurred in this district.

## IV.    FACTS

6.  At all times relevant, Rio was a minor female student enrolled in the District, where she attended Pinewood Elementary then North Side Middle School in Elkhart, Indiana. She was a smart, funny, creative and happy girl who loved reading, drawing sketches, music and school. She adored her 7-year old little sister.

7. The District posted this description of her on its Facebook page: "Rio had a beautiful smile, an infectious laugh, an incredible sense of humor, a kind heart, and brought happiness to those around her with her uplifting attitude. She was a bright light in her

classes, including band and choir, and faced difficult tasks like playing a solo or speaking at a concert with fierce determination and beaming confidence. Rio was an incredible person who loved and lived large."

8. "Rio enjoyed sketching, art, reading, video games, riding her bike and going camping with her family. She would make you laugh with her smart wit and sarcasm. She loved spending time with her BFF Lilli and her family. She will always be remembered for her infectious laugh." www.stemmlawsonpeterson.com/obituary/Rio-Allred

9. When local media outlets asked Niki to describe Rio: "She was the light to everybody who ever met her. She was funny. She was sarcastic and very witty."

   https://www.wndu.com/2022/03/17/candlelight-vigil-12-year-old-north-side-middle-school-student/?msclkid=a9f28d13aa3c11ecbb5072ce0055fd34

10. Niki's sister, Vanessa Cannady, described "Rio [as] the most beautiful, loving, caring, smart, sarcastic, charismatic young…yet so wise beyond her years young lady. Rio loved her family, she loved art, reading, band, camping, kayaking, playing video games."

    https://www.gofundme.com/f/rios-memorial-fund?utm_campaign=p_cp+share-sheet&utm_medium=copy_link_all&utm_source=customer

11. When she was in 4th grade, Rio met a female classmate called L.D. The two shared common interests and became best friends.

12. Unlike most girls her age, Rio had never shown any interest in boys or starting a family when she got older. One day in the summer of 2019 (when she was 10 years old and going into 5th grade), Rio disclosed to Niki that she was a lesbian. She and L.D. became romantic partners.

13. Afraid of being subjected to the usual social judgments and homophobia which accompany "coming out," she only shared this revelation with Niki and a handful of her closest friends; inevitably, however, word of Rio's secret spread through the school.

14. Their parents were aware of the girls' relationship and soon pretty much everyone at school knew that Rio and L.D. were partners.

15. Aside from being openly close with each other, the girls belonged to the GEM club, which is for students who identify as lesbian, gay, bisexual or transgender (LGBT). Marissa Batt, a social studies teacher employed by the District, was the faculty sponsor of the GEM club.

16. In or around December 2020, when Rio was in the 6th grade at Pinewood, she started losing her hair. At first, Niki noticed a bald spot, but soon Rio's hair started falling out by the handful. At that time, the District was still utilizing an "eLearning" method of instruction and Rio's classes were online, so she usually stayed home and only went to school occasionally for standardized assessments and band practice. Since Rio was taking classes at home, she was not around large groups of students on a daily basis. Instead, she hung around with a small group of friends, who were used to seeing her and became accustomed to watching her gradual hair loss as it happened.

17. In or around March of 2021, Rio was diagnosed with alopecia areata, an autoimmune condition which causes hair loss. It affects about seven million Americans and there is no known cure. https://www.naaf.org/alopecia-areata.

18. In a desperate attempt to save her shedding hair, Rio tried creams and injections. Nothing worked.

19. Even as her hair fell out and she developed patchy bald spots, Rio displayed incredible bravery and strength for a 12-year old girl.

20. After months of "virtual" learning, in the fall of 2021, District schools finally reopened for in-person instruction.

21. When school started, Rio tried concealing her head with bandanas and hats until eventually she had her parents shave her head when school started in the fall of 2021. Her grandmother bought her a beautiful brown wig which she loved.

22. On or around August 12, 2021, Rio started 7th grade at North Side. She was self-conscious and nervous, but excited about her new wig, eager to be back in school with her friends and play in the band. With the support of her loving family, she bravely entered the halls of North Side to begin 7th grade.

23. Rio quickly realized that her peers were less accepting of a 12-year old girl with no hair than her family, and she soon discovered the truth to the adage that there is no crueler place than the playground.

24. Within about two weeks after school started, students began harassing Rio because of her hair loss and sexual orientation—which literally proved to be a lethal combination.

25. People started calling her "Mr. Clean®," after the iconic bald male character conceived by Procter & Gamble in 1958 as the mascot for its brand of household cleaning products. Clad in all white and sporting a gold earring, he is described as a "muscular, tanned, bald man." https://en.wikipedia.org/wiki/Mr._Clean. His gleaming dome is a familiar sight to Americans; he even has his own Facebook page (www.facebook.com/mrclean) and Twitter account (www.twitter.com/realmrclean).

26. Not to be outdone, some students came up with the nickname "Caillou," the main character in an animated Canadian children's television series about an inquisitive four-year-old boy "popularized without a single hair on his head." www.chouette-publishing.com/caillou

27. Other students called Rio names that stung a little harder (e.g., "naked mole rat" and "bug-eyed alien"), but the common denominator was that they targeted her because she did not look like a "typical" girl.

28. Rio's rough start to 7th grade was only the beginning. Her numerous antagonists continued harassing her, spewing their hateful venom on practically a daily basis for the next seven months. One especially sadistic female student in particular, M.C., targeted Rio for relentless verbal and psychological abuse. She regularly taunted and ridiculed Rio, making cruel comments on her unusual appearance.

29. At the end of August 2021, M.C. ripped off Rio's wig in front of the class, exposing her head for all to see. A teacher was present when this occurred.

30. It is unknown what disciplinary action, if any, the District took against M.C. for the wig incident or other abuse which she regularly heaped upon Rio at school.

31. This was just the first of several wig-pulling incidents; after the initial incident with M.C. in August, other students pulled off Rio's wig at school.

32. On or about September 2, 2021, Jennifer Tashijan, a counselor employed by the District, received a report from Sandra Carnall, a band teacher employed by the District, that a female student called I.K. had smacked Rio, kicked her out of her chair and choked her.

33. Rio told Niki about the attack, which made her furious. Niki discussed the incident with Tashijan, who assured Niki that she would have I.K. come to her office the next day to

discuss what happened. Tashijan also told Niki that when I.K. came to her office, she was going to make I.K. call her mother in Tashijan's presence; however, Tashijan subsequently told Niki that she had not made I.K. call her mother because she believed that doing so was unnecessary. Instead, Tashijan said that she had simply spoken with I.K. about the incident.

34. It is unknown what disciplinary action (if any) the District took against I.K. as a result of her physical assault of Rio, and Tashijan would later admit that she did not report the incident to administration.

35. Another incident occurred after a band concert which Rio was unable to attend in October 2021, when a male student told her that she should kill herself.

36. Around the middle of October 2021, another female student, L.K., physically assaulted Rio in the girls' restroom at school, pushing her into the wall then slamming her head back and forth against it.[1]

37. Following a brief respite from her tormentors over Christmas break (December 2021-January 2022), the harassment of Rio continued in the spring semester.

38. On or about January 27, 2022, Rio sent Tashijan an email reporting that a male student, D.S., had been calling her "Mr. Clean," tripping her on the stairs and smacking her on the head.

39. Jacob Robaska, who was employed by the District as Assistant Band Director, had witnessed D.S. call Rio "Mr. Clean" during his class. Robaska had also heard reports that students were pulling off Rio's wig at school.

---

[1] Which constitutes Battery, a criminal offense under Indiana law.

40. One of Rio's worst antagonists at school was a male student called A.A., who took every opportunity he had to heap verbal abuse on the defenseless Rio. School counselors employed by the District (including Tashijan) were well aware of A.A.'s history of harassing students and Rio in particular, yet failed to take appropriate measures to stop him.

41. Another male student, C.M., used to hit Rio with his trombone case on a regular basis.

42. Rio's band teacher, Sandra Carnall, knew that C.M. was assaulting Rio and had asked him to stop, but he ignored her.

43. Carnall knew that Rio was being harassed at school and had been in communication with Niki regarding the situation as early as September 2021.

44. On or about February 22, 2022, Rio was in the hallway at school when a student snuck up on her and smacked her in the head. Completely taken off guard, Rio was not able to identify her attacker.

45. That same day, Claudia Burmeister, a social worker employed by the District, was approached by a student, N.P., who expressed concerns about Rio being bullied. Burmeister had Rio come to her office, where she confirmed what N.P. had reported and identified one of the perpetrators as B.H.

46. Rio's 7th grade science teacher, Robert Teitsma, admitted that he had heard that Rio "had been identifying as a boy" and that L.D. was her girlfriend. Teitsma also knew that "Rio had been getting grief about identifying as a boy and having a girlfriend as a girl." Upon information and belief, Teitsma never reported this information to Douglas Thorne, the District's Title IX Coordinator, or other adminstrators.

47. On or about February 23, 2022 (the day after the hallway assault), Rio and L.D. were attending a drama club activity in the school cafeteria when a female student called A.H. took L.D.'s iPad from her and drew a penis as the background on the display.

48. L.D. told her mother about the incident with her iPad and Rio, L.D. and/or L.D.'s mother also reported the incident to a North Side Principal.

49. Upon information and belief, the Principal did not report the iPad incident to Thorne, the District's Title IX Coordinator. However, the incident was captured on a school surveillance camera, and L.D.'s mother saw a video recording of it.

50. When she was in 6th grade at Pinewood (2020-2021), Rio had earned good grades in school, mostly As and Bs. By the time she was in 7th grade at North Side, she was getting Cs, Ds and Fs.

51. By the spring of 2022, Niki was beyond scared and frustrated; she was terrified, desperate and seething with anger. As far as she could tell, the District had done nothing over the preceding seven months to help Rio. If school authorities had done anything at all to address the situation, whatever they did was not working because the harassment continued. All indications were that the District was not taking it seriously and simply allowing it to continue.

52. Finally, Niki had had enough. She could not keep sending Rio to school every day knowing that she was putting her in such a hostile, cruel, frightening and dangerous environment while District employees stood there and let it happen. She requested a meeting with school personnel to discuss the situation.[2]

---

[2] Burmeister would later take credit, claiming that she had called Niki to schedule a meeting.

53. On or about March 2, 2022, Niki, Rio, Rio's sister, biological father and stepmother met with the school counselor (Tashijan) and social worker (Burmeister).

54. Rio stated that she was still being bullied and named the 4-5 students who were the worst offenders. Among the students she identified was D.S., whom Tashijan had spoken to on or around January 28, 2022, about bullying Rio but whom Tashijan said was "not a bad kid."

55. Rio and her family recounted the relentless verbal and physical abuse which Rio had been enduring at school on a daily basis since August. Niki expressed her fear, frustration and anger, but did her best to remain calm and respectful since she knew that if she lost her temper, school staff would not take her seriously.

56. During this meeting, Niki provided Tashijan and Burmeister with the names of several students who had been harassing Rio, along with details of their specific acts of physical and verbal abuse.

57. Niki shared a story which she had read about a 12-year old[3] boy in Utah who had just committed suicide after being bullied at school (https://www.sltrib.com/news/education/2022/02/25/utah-family-mourns-year/) and told them she was terrified about the possibility of Rio doing the same. She pleaded with Tashijan and Burmeister for help.

58. To help them get to the root of the problem, Niki gave Tashijan and Burmeister a list of names of the worst offenders and implored them to speak with their parents. Tashijan and Burmeister assured the family that they would contact the perpetrators' parents and get back to them, but Niki never heard from them again.

---

[3] Rio's age.

59. Tashijan and Burmeister's failure to get back to Niki after their March 2nd meeting upset her, but it was entirely consistent with the apathy which the District had shown towards Rio's plight over the preceding seven months. Burmeister would later claim that she had planned to get back to Rio's family after the March 2nd meeting, but that she did not have a chance to do so before Rio's death.

60. Mary Wisniewski, Assistant Principal at North Side, would later claim that she was unaware that Rio was being bullied until after she died when Tashijan and Burmeister informed her about the meeting which they had with the family on March 2nd.

61. A boy who attended school and was in band with Rio also suffered alopecia and lost all his hair, but her experience stood in stark contrast to his: the boy was popular and well-liked. Unlike Rio, he was not subjected to the same kind of harassment—if any—as she, who was harassed by other students at school almost daily from August 2021 until March of 2022.

62. Eventually, by early spring the pain of the of constant harassment, profanity, name-calling, ridicule, teasing, hateful comments and physical abuse which young Rio had endured for months became more than she could bear. Around 6:54 a.m. March 14, 2022, Niki's worst nightmare came true: she called for Rio to get ready for school, but she did not respond. When Niki went into her room to check on her, she discovered Rio's lifeless body hanging from the rail of her bunk bed.

63. Word of Rio's death spread quickly through the community and the people of Elkhart rallied to support her family, who were overwhelmed by the outpouring of love. Hundreds of people—many complete strangers—sent the family their condolences and included them in their prayers. Students held a candlelight vigil to honor her memory.

64. Local media outlets covered Rio's heartbreaking story, and soon other students and their parents came forward to share their personal experiences with bullying in the Elkhart school system.

65. It turns out that Rio's experience was not unique, and illustrates a systemic problem in Elkhart schools. Kids were terrified of going to school. Parents were afraid to send them. A recurring theme in their stories was that even when they reported bullying to teachers, counselors and administrators, the District failed to take appropriate action to stop it or support the victims.

66. The District's deliberate indifference to student-on-student harassment in its schools has fostered a culture which tolerates—even encourages—that type of behavior, resulting in a hostile educational environment.

67. Eight days after Rio took her own life, on or about March 22, 2022, the District's Board held a public meeting. According to a published summary of that meeting, the Board "heard seven (7) audience members voice concerns of student bullying across the district and the lack of action from the administration to effectively address complaints of bullying."

68. The minutes of the meeting reflect that "Superintendent Thalheimer recognized the impact [which] a student death has on all members of the school community. In response to those asking what is being done, Dr. Thalheimer reported [that] bullying protocols were a large part of the previous week's leadership team meeting….[T]he district is looking to add an additional layer of risk assessment for those students who report being bullied. Dr. Thalheimer reported [that] on March 23 there will be a principal meeting to review bullying investigation processes and to share successful interventions for bullying.

The district is also looking at how to better spell out and teach expectations for behavior, including bullying….Dr. Thalheimer reminded families that if a building is not responsive to a bullying report or a parent/guardian feels the investigation into bullying was not conducted satisfactorily, then they should report this to Student Services or the Superintendent's Office."

69. On or about April 12, 2022—about five weeks after Niki's meeting with Tashijan and Burmeister and a month after Rio's suicide—the District's Board held a public meeting to discuss harassment in its schools. According to the published summary of that meeting, nine members of the public expressed their "concerns of bullying in [the District] and what the District is doing to stop it."

70. Superintendent Thalheimer said that the District's "liability insurance carrier, Liberty Mutual, has had their Risk Control Services do a 'high-level overview' and shared that they 'found many of the components of [our] bullying prevention program do align with the best practices identified by multiple national resources.' Their suggestion is for us to audit various aspects of our processes and conduct student, parent, and staff surveys of what can be done to be more effective and consistent. Overall, findings show ECS needs to make sure anti-bullying efforts are ongoing because there is no end date for bullying prevention. While students are talked to about bullying at the beginning of the school year and provided information about reporting bullying…further steps need to be taken to ensure we maintain a 'see something/say something culture' all year round."

71. Thalheimer then listed several steps that the District would be taking, including training staff and students on bullying prevention, reporting and investigation. He told the Board

that the District was planning a parent event "that will define bullying and how the community can collaborate to reduce its occurrence."

72. At its April 26th public meeting, the Board "heard three audience members voice their concerns about bullying and expressed an interest in working with [the District] to be a part of the solution."

73. Assistant Superintendent Sarita Stevens announced that the District would be holding an Anti-Bullying Parent Assembly on May 12th, 2022.

74. On or about May 2, 2022, the District received Niki's Notice of Tort Claim.

75. At the Board's May 10, 2022, public meeting, a member of the audience expressed "concerns about bullying and expressed an interest in working with [the District] to be a part of the solution."

76. On May 12, 2022, the District held an anti-bullying forum for school administrators and parents. One of the messages which parents took away was administrators telling them that they needed to teach their children "how to cope."

77. The District held a regular Board meeting on May 24, 2022, followed by an executive session.

78. If one good thing came from Rio's death, it exposed a serious problem in the Elkhart school system. Parents spoke out at school board meetings. In a powerful message to District administrators, North Side students staged a walkout to protest their failure to address the bullying epidemic in Elkhart schools.

79. Superintendent Steve Thalheimer publicly acknowledged that bullying in schools has gotten worse over the past couple of years: "Generally, what we have seen is that because

of students' higher levels of anxiety, depression, suicidal ideation, students are just in a more vulnerable state…."

80. Assistant Superintendent Sarita Stevens publicly stated that each school in the District has staff who are tasked with investigating reports of bullying and determining whether they meet the definition of "bullying" under Indiana law. According to Stevens, most of the incidents reported are considered student "conflicts" by school administrators—not harassment or bullying.

81. This may explain why there is a widespread perception among Elkhart students and their parents that the District does not take bullying seriously (as demonstrated by its cavalier, "kids will be kids" attitude), and at least one brave teacher was quoted as saying "we're not doing enough to protect these people from getting bullied."

82. While District administrators may believe that using a euphemism to describe students' behavior relieves them of their legal obligations under Federal and State law, calling it "conflict" does not change the fundamental nature of the conduct (namely, harassment) or its impact on the victims, including the creation of a hostile educational environment.

83. Neither the District's anti-harassment policy (Policy 2266) nor its bullying prevention policy (Policy 5517.01) defines the term "conflict."

84. However, the District's own written policies prohibit sex discrimination, sexual harassment and bullying in its schools.

85. At all times relevant, the District had in effect a statement of non-discrimination which provided, in part: "Elkhart Community Schools does not discriminate on the basis of…sex (including transgender status, sexual orientation and  gender identity)…which are

classes protected by Federal and/or State law (collectively, "Protected Classes")

occurring in the Corporation's educational opportunities, programs, and/or activities…."

86. At all times relevant, the District had in effect a policy titled "Title IX Sexual Harassment

Policy" (Policy 2266) prohibiting discrimination on the basis of sex: "The Board of

School Trustees of Elkhart Community Schools noting the adverse effects discrimination

and harassment can have on student academic progress, social relationship, and/or

personal sense of self-worth…does not discriminate on the basis of sex in its educational

programs and activities...All forms of sex-based discrimination, including sexual

harassment, are prohibited pursuant to Board Policies 2260 and 3122ACS."

87. Section B of District Policy 2266 provides that "The Superintendent shall have overall

responsibility for implementing this Policy…."

88. Section B(2)(h) of the District's policy defines "sexual harassment" to include "conduct

on the basis of sex (including, without limitation, gender, sexual orientation, and/or

gender identity), occurring in a school system education program or activity," if it meets

one or more criteria listed. It then gives examples of prohibited behavior which include

"sexually suggestive remarks or jokes; Verbal harassment or abuse; Displaying or

distributing sexually suggestive pictures, in whatever form (e.g., drawings, photographs,

videos, irrespective of format); Harassing or sexually suggestive or offensive messages

written or electronic" and "Teasing or name-calling related to sexual characteristics or

the belief or perception an individual is not conforming to expected gender roles or

conduct."

89. The District's policy states that "Sexual harassment may be directed against a particular

person…whether of the opposite sex or the same sex."

16

90. The harassment which Rio was experiencing at school falls squarely within the District's own definition of "sexual harassment."

91. The same District policy designates Doug Thorne, General Counsel for the District, as the District's Title IX Coordinator, whom the policy directs "shall respond promptly to all general reports as well as formal complaints of sexual harassment."

92. In addition to promptly responding to all reports (formal and informal) of sexual harassment, the District's Title IX Coordinator (Thorne) is responsible for:

- meeting with a complainant, and informing the parent/guardian once the Title IX Coordinator becomes aware of allegations of conduct which could constitute sexual harassment as defined in this Policy;

- identification and implementation of supportive measures;

- signing or receiving formal complaints of sexual harassment;

- engaging with the parents/guardians of parties to any formal complaint of sexual harassment;

- coordinating with district and school-level personnel to facilitate and assure implementation of investigations, and remedies, and helping to assure the District otherwise meets its obligations associated with reports and complaints of sexual harassment;

- coordinating with the Superintendent with respect to assignment of persons to fulfill the District's obligations, both general and case specific, relative to this Policy (e.g., investigator, decision-makers, etc.; this may involve the retention of third party personnel.);

- coordinating with district and school-level personnel to assure appropriate

17

training and professional  development of employees and others in accordance

with §B-4 [see below] of this Policy; and

- helping to assure appropriate systems are identified and  maintained to centralize

sexual harassment records and  data.

93. Section B(4) of the District's policy provides:

All ECS employees shall receive regular training relative to  mandatory reporting
obligations, and any other responsibilities  they may have relative to this Policy. Title
IX Coordinators, investigators, decision-makers, and any  person who facilitates an
informal resolution process, must  receive training on the definition of sexual
harassment, this  Policy, the scope of the District's education program or activity,
and how to conduct an investigation (including the  requirements of the reporting and
the Title IX Grievance Process,  including hearings, appeals, and information
resolution  processes). The training must also include avoiding prejudgment  of the
facts, conflicts of interest, and bias.

Decision-makers must also receive training on issues of relevance  of questions and
evidence, including when questions about the  complainant's sexual predisposition
or prior sexual behavior are  not relevant. Investigators must receive training on
issues of relevance to  create an investigative report that fairly summarizes relevant
evidence.

94. Section B(10)(a) of the District's policy (emphasis original) provides:

Any person may report sexual harassment, whether  relating to her/himself or another
person. **However, if  any District employee – other than the employee  harasser,
or the Title IX Coordinator – receives  information of conduct which may
constitute sexual  harassment under this Policy, s/he shall, without  delay, inform
the Title IX Coordinator** of the alleged  sexual harassment. Failure to report will
subject the  employee to discipline up to and including dismissal.

A report of sexual harassment may be made at any time,  in person, by mail, by
telephone, electronic mail, or by  any other means that results in the Title IX
Coordinator receiving the person's verbal or written report.  Additionally, while the
District strongly encourages  reports of sexual harassment to be made directly to the
Title IX Coordinator, the report may be made to **any**  District staff member,
including, for instance, a  counselor, teacher, or principal.

95. Under section B(10)(b) of the District's policy:

> The district will promptly respond when there is actual knowledge of sexual harassment, even if a formal complaint has not been filed. The district shall treat complainants and respondents equitably by providing supportive measures to the complainant and by following the Title IX Grievance Process prior to imposing any disciplinary sanctions or other actions that are not supportive measures against a respondent. The Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures.

> As soon as reasonably possible after receiving a report of alleged sexual harassment from another ECS employee or after receiving a report directly through any means, the Title IX Coordinator shall contact the complainant to:

> - discuss the availability of and offer supportive measures;
> - consider the complainant's wishes with respect to supportive measures;
> - inform the complainant of the availability of supportive measures with or without the filing of a formal complaint; and
> - explain to the complainant the process for filing a formal complaint.

96. The District's policy sets forth procedures for taking disciplinary action against the alleged perpetrator(s) of harassment, but section B(10)(e) allows it to summarily remove students who pose an immediate threat:

> At any point after receiving a report or formal complaint of sexual harassment, the Title IX Coordinator (or other ECS official charged with a specific function under this Policy or the Title IX Process: e.g., investigator, decision-maker, etc.) may request the Superintendent to direct an individualized safety and risk analysis be performed to determine whether a…student…is an immediate threat to the physical health or safety of any person. In the event the safety and risk analysis determines the respondent student does present an immediate threat to the physical health and safety of any person, the District may remove that student…. Such emergency removal shall not be disciplinary. However, the District must provide the respondent with notice and an opportunity to challenge the decision immediately following the removal, and shall continue to offer educational programming until a final determination is made pursuant to the Title IX Grievance Process.

97. Upon information and belief, either (a) Thorne failed to follow one or more of the District's Title IX policies in response to multiple reports that Rio was being harassed at school, or (b) District employees failed to inform Thorne about conduct which may constitute sexual harassment under the District's policy.

98. In any event, neither Tashijan nor Burmeister provided Rio's parents with Thorne's contact information so that they could speak with him about filing a Title IX grievance, request the provision of supportive measures for Rio or request an investigation.

99. Thorne did not attend the meeting which Rio's family had with Tashijan and Burmeister on March 2, 2022.

100. Upon information and belief, from August 2021 until Rio's death in March of 2022, Thorne conducted no investigation into the reports that she was being harassed and physically assaulted at school. It was not until after Rio's suicide—when Elkhart Police Department officers requested his cooperation—that Thorne coordinated staff interviews with police and asked the District's information technology (IT) department to retrieve electronic mail and text messages which had been sent and received by Rio on her school-issued device(s).

101. In addition to the foregoing written sexual harassment policies, at all times relevant the District had in effect a written bullying prevention policy (Policy 5517.01) which defines "bullying" as "intentional behaviors involving unwanted and unwelcomed actions which are severe, persistent, or pervasive."

102. Under the District's written policy, "Bullying includes unwanted, often repeated, acts or gestures, including verbal or written communications or images transmitted in any manner (including digitally or electronically), physical acts committed, aggression, or

any other behaviors which are committed by a student or group of students against another student which have an effect of harassing, ridiculing, humiliating, intimidating or harming the targeted student and creating for the targeted student, an objectively hostile school environment which:

- places the targeted student in reasonable fear of harm to the targeted student's person or property;
- has a substantially detrimental effect on the targeted student's physical or mental health;
- has the effect of substantially interfering with the targeted student's academic performance; or
- has the effect of substantially interfering with the targeted student's ability to participate in or benefit from the services, activities, and privileges provided by the school."

103. The District's definition of "bullying" is similar to the statutory definition of that term in the Indiana Education Code. *See* IC § 20-33-8-0.2.

104. The conduct which Rio experienced at North Side falls squarely within the District's own definition of "bullying."

105. Superintendents Thalheimer and Stevens had final responsibility for enforcing the District's sexual harassment and bullying policies and training District employees on same.

106. Title IX Coordinator Thorne was responsible for implementing the District's sexual harassment policy and training District employees on same.

107. The building-level administrators with authority and primary disciplinary responsibility for enforcing the District's sexual harassment and bullying policies include North Side Principals Sara Jackowiak and Mary Wisniewski.

108. From the beginning of school in August 2021 until Rio's suicide in March of 2022, neither Jackowiak nor Wisniewski had ever met or communicated with Niki regarding

what Rio was experiencing at North Side. In fact, Wisniewski denied having any knowledge that Rio was being harassed at school until after her death.

109. At all times relevant, the District utilized a program called Sprigeo.com for students and parents to anonymously report bullying and threats. Wisniewski advised police that one report by Rio was entered into Sprigeo by school personnel after her death "so there would be documentation."

110. Thalheimer, Stevens and Thorne failed to follow the District's sexual harassment and bullying policies and failed to properly train District personnel on compliance with hose policies.

111. Jackowiak and Wisniewski failed to enforce District policy by failing to take appropriate disciplinary action against the students who were harassing and physically assaulting Rio at school. To the extent District personnel took any halfhearted measures in response to the harassment, those measures were ineffective in stopping it.

112. On June 8, 2022, the District held an anti-bullying meeting for parents. The District would not allow a local NBC affiliate which covered the meeting, WNDU 16 News Now in South Bend, to film the event or ask questions because parents would be sharing "confidential information," even though it was a public meeting.

113. According to an article published by WNDU, "over the past several months countless parents have openly shared their stories and frustrations…." over bullying in the District's schools.

114. There is reference in the article to Rio's suicide and one parent is quoted as saying "so many things are being swept under the rug. There's no accountability." Upon information and belief, this perception is shared by many District students and their parents.

## V.     CLAIMS FOR RELIEF
### COUNT 1
### TITLE IX

115. Plaintiff incorporates by reference her previous allegations as if set forth fully herein.

116. This claim is brought on behalf of Rio pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. and its implementing regulations, 34 C.F.R. § 106.1 ("Title IX").

117. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); 34 C.F.R. § 106.31(a).

118. Congress enacted Title IX to protect people like Rio from harassment and discrimination on the basis of one's sex (genetic, biological or anatomical), gender (socially-constructed norms associated with one's sex) or sexual orientation in the educational environment.

119. Courts apply a similar analysis to Title IX claims as they do when evaluating claims brought under Title VII.

120. Following amendments to Title IX's implementing regulations, on or about September 22, 2020, the District's Board of School Trustees passed a resolution directing "the

administration to draft and recommend for approval a permanent policy and procedure implementing the amended [Title IX] regulations."

www.docs.elkhart.k12.in.us/district/9_22_2020_Title_IX_Resolution.pdf

121. The District operates education programs or activities that receive federal financial assistance; namely, public schools, including but not limited to North Side Middle School.

122. A recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where it is deliberately indifferent to known acts of sex-based discrimination, including harassment which is motivated by (a) the victim's failure to conform to gender norms, or (b) his or her sexual orientation.

123. A cause of action under Title IX is not limited to claims of harassment or discrimination perpetrated by adults; the statute provides a remedy in damages against a school district in cases of student-on-student harassment where (a) the funding recipient is deliberately indifferent to sexual harassment of which it has actual knowledge; and (b) the harassment is so severe, pervasive and objectively offensive that it deprives the victim of access to the educational opportunities or benefits provided by the school district.

124. Harassment or discrimination which is motivated by a belief that the victim's appearance, behavior or mannerisms do not conform with traditional societal expectations associated with one's biological sex (i.e., males looking and acting "masculine" and females "feminine") is unlawful gender stereotyping.

125. Despite generations of females wearing short hair and males wearing long hair, one's hairstyle/length remains a classic (and stubborn) example of gender stereotyping.

126. Title IX guarantees students enrolled in public schools equal access to educational programs and benefits; a hostile learning environment at school may deny students such access.

127. Rio had the right to go to school in an environment free from harassment and discrimination based on gender stereotypes or sexual orientation while participating in an educational program or activity which receives federal financial assistance; namely, while attending North Side.

128. In addition to failing to follow its own written policy, the District has a *de facto* policy, custom or practice of not addressing student-on-student harassment in its schools by failing to properly investigate it, by failing to take supportive measures and by failing to prevent or stop it even in the face of actual knowledge that it was occurring. This policy, custom or practice of inaction cultivated or fostered a culture in the District which permitted a hostile environment to exist in District schools generally and at North Side (Rio's school) in particular. This hostile environment deprived Rio of educational opportunities and benefits provided by the District.

129. At all relevant times, Rio was on District property during school hours when she was subjected to multiple instances of harassment by other students over a period of approximately seven months, from approximately August of 2021 into March of 2022.

130. Rio was targeted for harassment by other students because of her sexual orientation and or because her appearance (being a bald female) failed to conform to traditional gender stereotypes. Therefore, while such conduct was generally considered "bullying," the conduct of the perpetrators also constitutes sexual harassment for purposes of Title IX.

25

131. Upon information and belief, one or more District employees witnessed the harassment of Rio at the hands of other students.

132. In addition to incidents which were witnessed by District employees, Rio, her family and other students reported the harassment to school personnel on multiple occasions.

133. At all times relevant, the students who harassed Rio were under the disciplinary authority of the District.

134. District employees had actual knowledge that Rio was being harassed and discriminated against on school property during school hours.

135. District personnel had the authority to address the harassment and take measures to stop it, yet they failed to conduct a proper investigation or adequately respond, which allowed the harassment to continue for several months.

136. Despite having actual knowledge of the way Rio was being treated by her peers, the District failed to follow its own written policy on sexual harassment, thereby rendering Rio more vulnerable to harassment.

137. The District's failure to follow its own policy includes:

- Failure of its Title IX Coordinator to respond promptly to all reports of harassment;

- Failure of its Title IX Coordinator to meet with Rio and her parent(s) after becoming aware of conduct which could constitute sexual harassment as defined by its own policy;

- Failure to identify and implement supportive measures;

- Failure to promptly conduct a proper investigation into reports of harassment;

- Failure of District staff to inform its Title IX Coordinator of alleged sexual harassment; and

- Failure to order an emergency removal of student(s) who posed an immediate threat to Rio's physical safety.

138. To the extent the District took any measures in response to the harassment, its response was clearly unreasonable in light of the known circumstances and failed to stop the harassment. Therefore, the District's response—or failure to respond—to the harassment constitutes deliberate indifference.

139. Among other acts and omissions on the part of District personnel over a period of several months, the District failed to properly investigate the numerous incidents of harassment.

140. The District failed to provide Rio with appropriate supportive measures or accommodations despite having firsthand knowledge or receiving reports of harassment.

141. Despite having actual knowledge that Rio was being harassed at school, the District failed to take appropriate steps to address or stop the harassment. As a result, Rio was rendered more vulnerable to the harassment and/or subjected to multiple instances of harassment at school over a period of several months.

142. The District failed to properly train its employees on compliance with Title IX and its implementing regulations; failed to adequately train school personnel how to recognize and address various forms of behavior which may be considered sexual harassment, including sex stereotyping and when "bullying" constitutes sexual harassment; and failed to properly train District employees on its own anti-harassment policies.

143. The District had a policy, custom or practice of not treating complaints of student-on-student gender- or sex-stereotyping as sexual harassment and of not investigating them as such.

144. Despite having actual knowledge that Rio was being harassed, the District failed to provide Rio or her parents with the name and contact information of its Title IX coordinator.

145. The District failed to inform Rio or her parents of its policies or procedures for filing a grievance or complaint of student-on-student sexual harassment.

146. In the alternative, the District failed to revise its existing policies or procedures on harassment.

147. The District's deliberate indifference to the sexual harassment of Rio denied her equal access to educational opportunities or benefits provided by the District, resulting in a tangible, negative effect on her education. Specifically, Rio had the right to attend school in an environment free of discrimination and harassment on the basis of her sexual orientation and failure to conform to traditional gender stereotypes; however, the harassment of Rio was so severe, pervasive and objectively offensive that it created a hostile environment at school, denied her equal access to educational opportunities and benefits afforded other students and caused her to commit suicide.

## COUNT 2

### EQUAL PROTECTION

148. Plaintiff incorporates her previous allegations as if fully set forth herein.

149. While Title IX implies a private right of action for victims of gender discrimination in schools, it does not preclude a plaintiff from asserting a parallel and concurrent constitutional claim for gender discrimination under 42 U.S.C. § 1983 based on the same conduct.

150. Gender is a protected class under the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution, which prohibits arbitrary discrimination by state actors, including discrimination on the basis of gender stereotyping and sexual orientation.

151. Rio was discriminated against by other students at school, who harassed her because of her sexual orientation and/or because her appearance did not conform to prevailing cultural gender norms, i.e., societal expectations of appearance typically associated with females.

152. At all times relevant, the District had actual knowledge that Rio was being harassed by other students but turned a blind eye to the harassment. This is partly due to the District's refusal to recognize harassment for what it is, labeling it with the softer euphemism "conflict" instead. Its failure to act in the face of such knowledge demonstrates the District's deliberate indifference towards (a) Rio's welfare, and (b) her right to attend school without being harassed because of her sexual orientation or because her appearance does not conform to traditional gender stereotypes.

153. The District's deliberate refusal to respond to reports of student-on-student harassment in its schools (both generally and with respect to Rio in particular) represents a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; indeed, the District's deliberate non-response to complaints of harassment in its schools amounts to a *de facto* policy of inaction.

154. As a result, the District's custom or practice of not responding to complaints of harassment led students to believe that they would not be punished for harassing other students and could get away with doing so. The District's inaction in the face of complaints by students and parents emboldened the perpetrators, who reasonably believed that they could harass their peers with impunity.

155. There is no rational basis or legitimate state interest to justify the District's inaction in the face of knowledge that Rio was being harassed at school.

156. By its custom or practice of ignoring student-on-student harassment and as a result of its deliberate indifference to Rio's rights, the District subjected her to gender stereotyping and/or sexual orientation discrimination which created a hostile environment at school.

157. This discrimination deprived Rio of the equal protection of the law in violation of the Fourteenth Amendment to the Constitution.

158. As a direct and proximate result of the District's custom, policy or practice of ignoring students' harassment of and discrimination against Rio on the basis of gender stereotyping and/or sexual orientation, she suffered damages.

## COUNT 3

### WRONGFUL DEATH

159. Plaintiff incorporates her previous allegations as if fully set forth herein.

160. This claim is brought under the Indiana Child Wrongful Death Act, IC § 34-23-2-1.

161. There is a history of student-on-student harassment and bullying in the District which is well-known to agents and employees of the District.

162. At all times relevant, District personnel—including teachers, staff, administrators and members of the school board—were aware of the existence and magnitude of bullying and harassment which was occurring in schools operated by the District, including but not limited to North Side.

163. Since the beginning of 7th grade around August/September 2021, employees of the District knew that Rio was being verbally harassed and physically assaulted by other students at school on a regular basis.

164. District personnel were also aware that students who are subjected to harassment and bullying are at increased risk for anxiety, depression, self-injury and suicide ("bullycide"). This well-known fact is common knowledge among school administrators across the country and has been the subject of extensive nationwide media coverage for decades.

165. At all times relevant, the District owed Rio a duty of reasonable care and supervision.

166. The District breached this duty by failing to exercise reasonable care and supervision of students in its school, including Rio, and failing to protect Rio from the reasonably foreseeable conduct of other students.

167. In addition to its failure to exercise reasonable care and supervision, the District failed to comply with its own written anti-harassment and anti-bullying polices. This failure to comply with its own policies constitutes negligence *per se.*

168. As a direct and proximate result of (a) the District's negligent acts or omissions, and (b) its failure to comply with its own policies, Rio was subjected to a relentless campaign of verbal, psychological and physical harassment, bullying, ridicule and abuse by other students at school.

169. This harassment caused Rio to experience personal injury, severe anxiety, depression and emotional distress which resulted in her suicide.

## VI.   RELIEF REQUESTED

WHEREFORE Plaintiff, by counsel, respectfully requests the following relief:

1.  Judgment in her favor and against Defendants;

2.  Damages in an amount sufficient to compensate her for her losses;

3.  Punitive damages;

4.  Reasonable attorney fees;

5.  Pre- and post-judgment interest;

6.  Costs; and

7.  All other relief reasonable in the premises.

Respectfully submitted,

/S/Thomas W. Blessing
Thomas W. Blessing (#15696-49)
MASSILLAMANY JETER & CARSON, LLP
11650 Lantern Road, Suite 204
Fishers, IN 46038
Telephone: (317) 576-8580
Facsimile: (317) 203-1012
E-mail:  tom@mjcattorneys.com

*Attorney for Plaintiff*